[Cite as *State v. Lewis*, 2011-Ohio-6155.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95964**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## NNE LEWIS

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-533055

**BEFORE:**   Sweeney, J., Stewart, P.J., and Rocco, J.

**RELEASED AND JOURNALIZED:**   December 1, 2011

**ATTORNEY FOR APPELLANT**

John H. Lawson, Esq.
Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio 44103

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: Brent C. Kirvel, Esq.
        Erica Barnhill, Esq.
Assistant County Prosecutors
Ninth Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

{¶ 1}  Defendant-appellant Nne Lewis ("defendant") appeals his conviction for murder with firearm specifications. For the reasons that follow, we affirm.

{¶ 2}  On January 6, 2010, defendant's cousin Erik Lewis was pronounced dead from multiple gunshot wounds. His death was ruled a homicide.

{¶ 3}  Prior to Erik's death, both he and defendant were residing with their aunt and uncle, Cynthia Lewis Anderson and Isaac James Anderson at their Allandale Avenue home in East Cleveland.  Many witnesses described the relationship between defendant

and Erik as being very close, like brothers. It was said that they never fought and were raised together by defendant's father and Erik's mother, who were siblings that lived across the street from one another. Nne's father put him out of the house for "trust issues" relating to Nne's use of his father's credit card to purchase an engagement ring. Nne's father intended for his son to return to his home and repent and was not happy that his sister Cynthia had "housed" him. Cynthia testified to her understanding that Nne had also attempted to remove his father's guns from the house. Nne's father denied that and said Nne did not know the combination to the safe where his 9 mm guns were kept.

{¶ 4}  Nne's father described him as a docile person who did not have the stomach for violence. Several witnesses testified that Nne and his girlfriend TaShawna had a tumultuous relationship where they physically attacked one another. At one point, TaShawna's brother Michael physically assaulted defendant in retaliation for abusing his sister. This was witnessed by TaShawna, her mother, and several other people and was confirmed by Michael. When the couple expressed their intent to remain together, Michael distanced himself from the situation. Michael was at the hospital with his daughter at the time of Erik's murder and he passed a "stress test" administered by the police. Video surveillance from the hospital reportedly confirmed his alibi.

{¶ 5}  TaShawna said that defendant repeatedly accused her of being unfaithful with "everyone," including his cousin Erik. Although she testified she had remained faithful to defendant, she for some reason let, and at times intentionally lead, defendant to

believe the opposite was true. Regardless, there was no mention of Erik in this regard during defendant's conversations with TaShawna on January 6, 2010. On that day, she was leaving defendant with the impression that she had been with another man. Both that man and TaShawna's friend said she told them she was breaking up with Nne that night. TaShawna said she did not break up with Nne but continued to converse with him by phone into the early morning hours.

{¶ 6} TaShawna said she had observed defendant with a gun on three occasions. Her mother also testified that defendant brought a gun into her home once. Cynthia said she would never allow a weapon in her home and was not aware of one being there, however, she did not go through her nephew's belongings.

{¶ 7} Cynthia and Isaac both said Nne was the only other person home when they went to bed on January 5-6, 2010. Isaac, who went upstairs around 1:00 a.m., indicated that Erik was usually home from work earlier but had not yet returned by that time this particular day. Cynthia corroborated this fact.

{¶ 8} The autopsy report indicated that Erik had consumed alcohol shortly before his death; approximately six drinks. Erik's girlfriend had spoken with him but did not know where he went after work. No one was able to identify where Erik had been before returning to the Allandale home. An officer on patrol saw him walking towards Allandale just moments before his death but did not observe the murder.

{¶ 9} Erik's mother and defendant's father testified that Erik was a great person.

By all accounts he was a hard worker, spent some time in military training, supported his daughter and had no known enemies. He and defendant were active in the community, avid basketball players and musicians. Erik's mother expressed her dissatisfaction with the investigation and her belief that defendant had nothing to do with her son's death.

{¶ 10} Cynthia awoke to gunfire and observed flashes of light outside. At trial she said it sounded like the shooter was coming up the stairs as the shots sounded closer. She may have told police that it sounded like the shooter was coming in the house. She called 9-1-1 and heard her daughter Zoe pick up the phone requesting an ambulance. Cynthia ventured down the stairs and realized that the victim was Erik; not Nne as Isaac had initially thought. She did not see Nne and was concerned for his safety. Cynthia called Nne's girlfriend TaShawna looking for Nne. Nne's father went to the hospital and later returned to Cynthia's house. Cynthia testified that Nne's father said, "Don't be surprised if Nne has something to do with this." Nne's father adamantly denied making such a statement and insisted his son had not murdered his cousin. Nne's father said he based his opinion on Nne's statement to police and the evidence but had not ever discussed the matter with his son directly.

{¶ 11} Cynthia and Isaac testified that Nne was last seen on the telephone and they assumed he had been talking to TaShawna. According to TaShawna, she had been speaking with Nne and had intentionally lead him to believe that she was having sex with another man that night. This apparently upset Nne, who told TaShawna he could not

wait until Erik got home so he could tell him what she had done. However, TaShawna spoke with Nne subsequently when she returned to her house and things had calmed down. Nne got off the phone with her and said he would call her back. She did not hear from him again until later that morning and after Erik had died. TaShawna indicated that when the subject of Erik's death arose, defendant asked her "was he your first?" — which she took to mean her first lover.

{¶ 12} Isaac also heard the gunfire and thought perhaps some shots were fired from the outside. He went downstairs to investigate and saw a body laying in front of the doorway. The door was opened but the screendoor was shut. He initially thought it was Nne. Isaac's daughter Zoe arrived home from work and saw the body in the doorway.

{¶ 13} Several officers and EMS responded to the scene within minutes. Officers recovered six fired cartridge casings and three spent bullets from the scene; they were all from the same 9 mm gun. One bullet was found in a neighboring home and another was found days later in the basement of the Allandale residence.

{¶ 14} One man testified that he saw defendant walking quickly down Allandale immediately after the shots were fired. He described the gunfire as being distant, not "personal," otherwise he would have left the area. He could not recall specifics because he was intoxicated, having been drinking for hours in a car with his friends. Another man had been loitering outside a nearby Convenient store and had also seen defendant that night. Both men identified defendant's picture from a photo array. Both individuals

had criminal records and testified that the state had intervened in their cases to aid in their ability to remain on probation despite violations.[1] They recalled that defendant was wearing dark clothing.

{¶ 15} Later that morning, defendant appeared at the home of a woman who lived on East 143rd Street asking to use the phone. He had spent the night in an abandoned home. The woman believed defendant was calling his girlfriend to pick him up. When she overheard defendant repeatedly asking if his girlfriend's people had anything to do with it, she suspected something was wrong. The woman inquired further of what had happened and defendant said someone had shot his cousin and was shooting at him. Defendant then called his father to pick him up. The woman recalled that defendant was wearing only a white sweatshirt, which she felt was inappropriate for the extremely cold weather. She had offered him a coat.

{¶ 16} Defendant's father picked him up from that location but almost immediately thereafter the police arrested defendant. Defendant looked scared and defendant's father said his actions made sense to him as defendant was in fear for his own life.

{¶ 17} Defendant waived his Miranda rights and voluntarily spoke to police. He also agreed to submit his DNA for testing. Defendant said he heard the door open and then shots were fired. He heard the victim asking why did you do that? Defendant's hearing was affected from the gunshots and he ran out of the house over "the body."

---

[1] Probation was only continued for one of the men and the other was sent to prison.

Defendant told police he encountered his Aunt Cynthia at the steps. Defendant at one point in his statement told police that he was shot from the front of the house and at another time said shots were fired at him from behind the house. The detective testified that he did not feel defendant was being forthcoming and therefore decided not to obtain a written statement from him.

{¶ 18} Many neighbors testified and said they did not hear any gunfire. One resident, who had been awake, heard the shots but only saw a dark figure running down the street. Another man had observed a car parked and running in front of Cynthia's residence, which he found unusual, however, this was at least an hour prior to the shooting. The men who were drinking in the car outside did not see anyone besides defendant.

{¶ 19} The East Cleveland Police utilized the services of BCI to prepare a shooting reconstruction. Agent Mark Kollar conducted an investigation and concluded that the bullet trajectory determinations indicated that the shots were fired from inside of the residence, with at least one bullet being fired from the first floor landing on the stairwell. A second bullet hole could have been fired from either inside or outside of the residence depending upon the angle of the front door at the time of impact. Kollar concluded that the fact that the first responders found the door angle being open beyond 90 degrees with the victim laying inside, made it more likely the shot was fired from inside. Although a bullet was found in a neighboring residence, Kollar opined that it had exited through the

storm door and ricocheted off the front driveway into the neighboring home. He noted that this would account for the bullet's insufficient energy to penetrate the wall it ultimately struck as well as the deformity of the bullet.

{¶ 20} The Cuyahoga County Coroner testified regarding the gunshot wounds to the victim. He was unable to state with certainty how many times the victim was shot because the wounds could overlap. The Coroner estimated there were eight or possibly nine shots fired. There were some shots that went from the back to the front and others that entered from the front and exited from the back. He explained that the position of the body at time of impact was not known and would affect this determination. There was conflicting evidence as to whether a bullet hole in the victim's back was an entrance or exit wound.

{¶ 21} Gunshot primer residue was collected from the victim's hands but not tested. Likewise, the fingernail scrapings were collected but not tested. The experts explained this testing was not done because the reports indicated that there was no close contact between the victim and the shooter.

{¶ 22} The trace evidence supervisor of the Coroner's office testified that there were eleven bullet holes in the victim's jacket, which could be both entrance and exit holes. He testified that testing revealed that several shots were fired from a distance of four to five feet or more, while others indicated shots being fired between one and three feet, still others were inconclusive for distance. The trace evidence supervisor said if

someone fires a gun they will have gunshot primer residue ("GSR") on their hands. However, GSR is easily removed from the skin. While GSR can also be removed from clothing, it is more difficult due to it getting embedded in the weave of the fabric.

{¶ 23} Defendant was tested for GSR, however, the police did not test any other occupants of the Allandale home for GSR who were also present at the scene of the murder; which included Cynthia, Isaac, and Zoe.

{¶ 24} Samples of defendant's clothing were submitted for testing, including the cuff and pocket portions of his sweatshirt. Two particles that are highly indicative of GSR were found on defendant's left cuff and pocket area. Records indicate that defendant is right handed. No GSR particles were found on the samples taken from his pants. There was insufficient DNA obtained from the bullets to run any testing on it.

{¶ 25} Tests conducted on the spent casings indicated they were all from the same type of bullet. Several witnesses testified that 9 mm guns expel casings but revolvers do not.

{¶ 26} Cynthia testified that it was her personal opinion that defendant had committed the crime. Under cross-examination she admitted that this was not based on any evidence but was told to her by the Lord during prayer. Conversely, the victim's mother, also defendant's aunt, echoed defendant's father's opinion that defendant had not committed the murder and explained that this opinion was derived from the evidence and their understanding of his relationship with his cousin. She, however, also had not spoken

with defendant directly about the incident.

**{¶ 27}** The murder weapon was never recovered and defendant's father testified that he had possession of both of his 9 mm guns at the time in question.

**{¶ 28}** The jury found defendant guilty and the trial court imposed an eighteen year to life prison sentence. Defendant appeals.

**{¶ 29}** "Assignment of Error I: The guilty verdict and conviction found by the jury against Appellant was based upon insufficient evidence."

**{¶ 30}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

**{¶ 31}** As the record reflects, the case against defendant is almost entirely based on circumstantial evidence. Nonetheless, "[p]roof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence. All three classes have equal probative value, and circumstantial evidence has no less value than the others." (Citations and quotations omitted.) *State v. Nicely* (1988), 39 Ohio St.3d 147, 151, 529 N.E.2d 1236.

{¶ 32} Defendant argues that the evidence was insufficient to prove that he purposely caused his cousin's death and focuses on the following areas: gunshot primer residue, negative DNA tests, the shooting reconstruction, defendant's flight and period of absence, his access to guns, his suggested jealousy, and his relationship with TaShawna.

{¶ 33} In terms of a sufficiency analysis, the focus remains on whether the state has presented any evidence, that if believed, would support a conviction of murder pursuant to R.C. 2903.02(A) that defendant "purposely cause[d] the death of [Erik Lewis]."

{¶ 34} Distilling the evidence to the basics, the record presents evidence that defendant was home with Cynthia and Isaac when Erik entered the home. Shots were fired. Cynthia and Isaac came downstairs and found Erik lying in the doorway with multiple gunshot wounds. Zoe arrived almost immediately after the shooting and also observed Erik's body.

{¶ 35} Nne, who was home when Isaac went to bed at 1:00 a.m. and placed himself there when shots were being fired, was no longer there when Cynthia and Isaac discovered the body. Eyewitnesses saw him walking down the street right after shots were fired. Although defendant made a statement that he ran away in fear for his life, while being shot at, he was seen walking quickly down the street after shots had already been fired. Defendant was inconsistent in his statement to police as to the location of the shooter. He heard his cousin come inside and said the gunshots affected his hearing.

Yet, he was able to leave the home going over Erik's body and said he was shot at from outside. This is contrary to Cynthia and Isaac's testimony that indicated the shooter sounded further inside the house with each successive shot.

{¶ 36} The shooting reconstruction concluded that the shots were likely fired from inside the home and most of the neighbors did not hear the gunfire at all. The eyewitnesses described defendant as wearing dark clothes when he was seen leaving the scene yet he had on a white sweatshirt when he was arrested ten hours later. He did have some particles indicative of GSR on some parts of his clothes that were tested despite that he had been absent for approximately ten hours. The defense was able to suggest the possibility of more than one shooter based on the number of gunshot wounds found in the victim's body and the fact that some weapons do not expel bullets. However, the evidence collected from the scene was all consistent with having been fired from the same weapon. The defense also elicited testimony of a possible robbery. But, Cynthia testified she held the victim's money, which would account for the fact that he was found with only change in his pocket. Also, nothing had been taken from the Allandale residence. No weapon was recovered but testimony placed defendant in possession of guns on at least three occasions and indicated he may have attempted to recently remove guns from his father's home. There was sufficient evidence to sustain a murder conviction and this assignment of error is overruled.

**{¶ 37}** "Assignment of Error II: the guilty verdict and conviction were against the manifest weight of the evidence."

**{¶ 38}** To warrant reversal of a verdict under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

**{¶ 39}** Having thoroughly reviewed the record, we cannot conclude that the jury clearly lost its way in convicting defendant.

**{¶ 40}** Defendant admits he was in the home when the shooting occurred. He takes exception with the conclusions of the shooting reconstructionist that all shots were likely fired from inside of the residence and points to Cynthia's testimony that she saw "flashing" outside her window. While this may cast some doubt as to the location of the shooter, it does not render the jury's verdict against the manifest weight of the evidence or lead to the conclusion that the jury clearly lost its way.

**{¶ 41}** We agree that the jury could have reached a contrary verdict based on the evidence, depending upon the weight they applied to it. Nonetheless, there is evidence in the record that does support his conviction; among it the detective's testimony that defendant's version of events was inconsistent and was also contradicted by other

evidence in the record. Defendant did have some GSR on him. While it was a small amount, the testimony indicated additional GSR evidence could have been lost or removed during the period of defendant's absence. Further, the jurors received a flight instruction; that permitted the jury to consider defendant's flight as evidence of his consciousness of guilt. Defendant believes the evidence of his possession of guns, physical altercations with TaShawna, and his jealousy of his cousin were "remote" and should weigh against his conviction. Defendant highlights the lack of direct evidence linking him to the crime. As set forth above, the law does not require the state to present direct evidence in order to sustain a conviction and provides that circumstantial evidence is to be accorded the same weight. Considering the record as a whole, defendant's conviction was not against the manifest weight of the evidence and this assignment of error is overruled.

{¶ 42} "Assignment of Error III: Appellant's trial counsel committed ineffective assistance of counsel."

{¶ 43} To substantiate a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) the performance of defense counsel was seriously flawed and deficient, and (2) the result of defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Brooks* (1986), 25 Ohio St.3d 144, 495 N.E.2d 407. In *State v. Bradley*, the Ohio Supreme Court truncated this

standard, holding that reviewing courts need not examine counsel's performance if the defendant fails to prove the second prong of prejudicial effect. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. "The object of an ineffectiveness claim is not to grade counsel's performance." Id. at 143, 538 N.E.2d 373.

{¶ 44} Defendant asserts his counsel was ineffective for failing to request a jury instruction with regard to the lesser included offense of voluntary manslaughter. The Supreme Court of Ohio, in *State v. Griffie* (1996), 74 Ohio St.3d 332, 658 N.E.2d 764, held that the decision to request a jury instruction with regard to a lesser-included offense is a matter of trial strategy and does not constitute ineffective assistance of trial counsel. See, also, *State v. Clayton* (1980), 62 Ohio St.2d 45, 402 N.E.2d 1189, certiorari denied (1980), 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102. It must also be noted that a defendant is not entitled to an instruction on a lesser-included offense if participation in the charged wrongdoing is denied. *State v. Reider* (Aug. 3, 2000), Cuyahoga App. No. 76649.

{¶ 45} During the course of trial and even on appeal, defendant's trial strategy involved a complete denial of any criminal activity, that resulted in the death of the victim. Defendant's trial strategy prevented any request for a jury instruction with regard to the offense of voluntary manslaughter. *State v. Reider*, supra. Accordingly, trial counsel was not ineffective in this regard.

{¶ 46} Secondly, defendant asserts that his attorney was ineffective because he elicited testimony from his aunt that she based her opinion of his guilt on the fact that the "Lord told" her that defendant did it. This did not amount to ineffective assistance of counsel. Cynthia's direct testimony and that of other family members clearly implied her belief that defendant was guilty of the murder. The defense simply elicited testimony that she had not based this opinion on any evidence. The defense further supplied testimony from the victim's own mother, also defendant's aunt, that she did not believe defendant had committed the murder. This was supported by defendant's father's opinion that he did not commit the crime. Counsel's scope of cross-examination was within the realm of trial strategy and did not constitute ineffective assistance of counsel.

{¶ 47} This assignment of error is overruled.

{¶ 48} "Assignment of Error IV: The trial court erred in permitting hearsay testimony to be admitted."

{¶ 49} During direct examination of Cynthia Lewis the following exchange took place over defendant's objection:

{¶ 50} "Q: Did your brother ever make a comment to you that you felt was concerning to you?

{¶ 51} "A. Yes.

{¶ 52} "Q. What was that comment?

{¶ 53} "[Defense counsel]: Objection

**{¶ 54}** "THE COURT: Overruled.

**{¶ 55}** "A. The comment was, 'Don't be surprised if Nne has something to do with this.'"

**{¶ 56}** Defendant submits that this testimony amounted to hearsay and its admission resulted in prejudicial error requiring reversal. The state responds that any error in its admission was harmless in that the defense called defendant's father to the stand who denied making the statement.

**{¶ 57}** Hearsay is any statement, other than one made by a declarant at trial, which is offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Generally, a statement is not hearsay if it is admitted to prove that the declarant made it, rather than to prove its contents. *State v. Williams* (1988), 38 Ohio St.3d 346, 348, 528 N.E.2d 910, 914. It is unclear whether the state offered the testimony to prove that defendant's father simply made the statement or whether they were offering it to prove its truth, that his father believed defendant may have been involved in his cousin's murder. Because the State has not maintained it had offered the testimony for some reason other than to prove the truth of the matter asserted therein nor has the State addressed the hearsay aspect of the testimony at all, we will presume the testimony qualified as hearsay and should not have been admitted. Nonetheless, defendant was able to confront the declarant, his father, about the alleged statement during his case-in-chief. Defendant's father adamantly denied making such a statement. The Ohio Supreme Court directs, "the Constitution entitles a

criminal defendant to a fair trial, not a perfect one * * * [and] ha[s] repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Williams*, supra at 349, other citations omitted. Any error in admitting this isolated testimony by defendant's aunt, which was unequivocally refuted by defendant's father's testimony, was harmless beyond a reasonable doubt when considering the whole record. This assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

JAMES J. SWEENEY, JUDGE

MELODY J. STEWART, P.J., and
KENNETH A. ROCCO, J., CONCUR